**Hossein MILANI, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, INC., Defendant.**

**No. 02 Civ. 3346(MBM).**

United States District Court, S.D. New York.

June 14, 2004.

Neal Brickman, Ramon A. Pagan, The Law Offices of Neal Brickman, New York, NY, for Plaintiff.

Allan Bloom, Steven M. Warshawsky, Paul Hastings Janofsky & Walker, New York, NY, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Hossein Milani sues his former employer, International Business Machines Corporation, Inc., ("IBM"), alleging discrimination based on age and national origin in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 (McKinney 2003) ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–107 and 8–502 et seq. ("NYCHRL"). IBM moves for summary judgment on all claims and for sanctions, costs, and attorney's fees. For the reasons stated below, IBM's motion for summary judgment is granted, and the parties are directed to submit additional briefs on the issue of sanctions.

## I.

The following facts are either undisputed or presented in the light most favorable to plaintiff.

Milani was born in Iran on October 23, 1953,[1] and named Hossein Ghasedi. (Affirmation of Ramon Pagan ("Pagan Aff."), Ex. A ("Milani Aff.") ¶ 2) He moved to the United States in 1978 and became a United States citizen in 1991. (Affirmation of Allan S. Bloom ("Bloom Aff."), Ex. 1 ("Milani Dep.") at 12) He lives now in Greenwich, Connecticut. (Id. at 9)

### A. Milani's Work History at IBM

After completing a Ph.D. in mechanical engineering at Columbia University, Milani was hired by IBM in 1985 to work as an associate engineer in its Brooklyn Data Systems Division. (Milani Aff. ¶¶ 5–7) In May 1986, Milani was promoted to senior associate engineer, and in mid–1987, he was transferred to IBM's Sales and Marketing Division on Madison Avenue. (Id. ¶ 15; Milani Dep. at 234, 248–49)

At the Madison Avenue location, Milani started working as an account systems engineer in the Higher Education Unit of the Public Sector Branch. (Milani Aff. ¶ 16) Following a successful year for his sales team, Milani was promoted to advisory systems engineer in late 1988.[2] (Milani Dep. at 335–36)

According to his Work History Detail Report at IBM, Milani made a lateral move from advisory systems engineer to advisory marketing representative in 1991, and he was promoted to senior marketing representative in 1993. (Pagan Aff., Ex. F) Between 1992 and 1994, Milani became a key member of the Higher Education sale team, and at one point he was responsible for 25% of the work in his department, which had 11 other employees. (Milani Aff. ¶ 27) In 1994, Milani was promoted to a Level 58 position at IBM, which is also known as "Band 8"; he describes this promotion as the promotion he

---

1. Although Milani states in his complaint that he was over the age of 40 at all relevant times (Compl. ¶ 2), he did not actually turn 40 until 1993, long after many of the events of alleged discrimination about which he complains.

2. Although Milani's Work History Detail Report from IBM reports that he was not promoted to advisory systems engineer until mid–1989, Milani, who was shown this report at his deposition, explained that he was officially made an advisory systems engineer by the end of December 1988 even though the report did not reflect that. (Compare Pagan Aff., Ex. F with Milani Dep. at 335–36) Because all inferences must be drawn in Milani's favor for the purposes of this motion, Milani's memory of his promotion date controls.

was first promised in 1988.[3] (*Id.* ¶ 29; Milani Dep. at 377) In 1995, Milani was promoted from his Band 8, Level 58 position to a Band 9, Level 59 position. (Milani Aff. ¶ 32; Pagan Aff., Ex. F)

In 1998, IBM required Milani to complete a rigorous and extensive three-week program at Harvard Business School, paid for by IBM. (Milani Dep. at 29) Milani was told that he needed to complete the course in order to be eligible for a Band 10 position. (Milani Aff. ¶ 37) The course had a writing requirement, but Milani never wrote the required paper because he knew that another employee, Robert Barthelmes, had been promoted to Band 10 without completing the paper. (Pagan Aff., Ex. H ("Barthelmes Dep.") at 53–54; Milani Dep. at 389; Milani Aff. ¶ 37) Indeed, it is not clear that certification through the Harvard course was even a prerequisite to a promotion to Band 10. (*Compare* Barthelmes Dep. at 54–55 *with* Pagan Aff., Ex. I ("Cooper Dep.") at 25–26) However, Milani was never promoted to Band 10 at IBM. (Milani Aff. ¶ 37)

In July 1999, Barthelmes, who recently had been named Milani's supervisor, promoted Milani to business unit executive, which was functionally a team leader job; Milani was happy to get this promotion and thought, "I am breaking into the management opening, or at least I'm at the door." [4] (Milani Dep. at 391; Barthelmes Dep. at 55) Barthelmes gave Milani a favorable evaluation for the second half of 1999 and wrote, "I'm very proud to have Hossein as a member of the management team." (Milani Dep. at 393; Pagan Aff., Ex. J, at 8) Barthelmes also recommended Milani for a salary increase in 1999, which was approved by IBM management. (Barthelmes Dep. at 63–64) At some point in 2000, Barthelmes and his supervisor, Marianne Cooper, discussed promoting Milani to Band 10, and they agreed that Milani should be promoted once he was certified as having completed the Harvard program. (*Id.* at 71)

In the summer of 2000, Milani completed "The Basic Blue", a course at IBM's new management school that included a

---

**3.** In his complaint and deposition, Milani says that this was a promotion to "senior systems engineer". (Compl. ¶ 19; Milani Dep. at 377) However, Milani's Work History Detail Report from IBM states that Milani's new job title was a different Level 58 position, senior client representative (Pagan Aff., Ex. F), and in his affidavit, Milani no longer characterizes the new position as "senior systems engineer", stating only that he was "finally promoted to level 58, or Band 8." (Milani Aff. ¶ 29)

**4.** In his affidavit, Milani states that Barthelmes never promoted him. (Milani Aff. ¶ 38) However, Milani gave the following testimony at his deposition:

Q. Is it not true that Mr. Barthelmes promoted you?

A. He made me a manager. As I mentioned, it was a team leader job, really. It was not a real management job.

Q. Were you pleased to be promoted?

A. I thought that would be an opening for me. Yeah, I was happy at this. I said, I

am breaking into the management opening, or at least I'm at the door. But I knew without the Band 10, without the proper management, that was meaningless.

(Milani Dep. at 391) Because Milani's deposition testimony contradicts Milani's claim in his affidavit that Barthelmes never promoted him, this aspect of Milani's affidavit will be disregarded for the purposes of this motion. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."); *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997) (discounting plaintiff's declaration in opposition to summary judgment insofar as it contradicted plaintiff's earlier deposition testimony).

week-long class and several weeks of self-study. (Milani Dep. at 30) During his Basic Blue training, Milani became familiar with various IBM employment policies, including IBM's prohibition on dating subordinates.[5] (*Id.* at 93)

At the end of 2000, Barthelmes again rated Milani very highly. (Milani Dep. at 394–95; Pagan Aff., Ex. K) Between August 1999 and May 2001, Milani's monthly salary increased from $7,629.70 to $9,161. (Pagan Aff., Ex. F) Milani also received a $500 bonus at the end of 1999 and a $4,000 bonus at the end of 2000. (*Id.*) Barthelmes and Milani had a good working relationship that Milani characterized as "very cordial", and Barthelmes once evaluated Milani as the top salesman in the Northeast. (Milani Dep. at 178)

As of September 2000, Milani was the business unit executive for IBM education for the Northeast. (*Id.* at 67) He managed education sales for New York, New Jersey, Pennsylvania, and Delaware that included hardware, software, and services for the education market. (*Id.*) As a business unit executive, Milani had the power to promote and hire his subordinates so long as Barthelmes "signed off" on the decisions. (Barthelmes Dep. at 81)

### B. *Alleged Discrimination at IBM before 2001*

When Milani first began work at IBM in 1985, he learned that IBM had an employment policy against discrimination based on national origin, age,[6] and other types of group status. (Milani Dep. at 216; Milani Aff. ¶ 8) However, Milani's first supervisor told him that IBM just used this policy as a "cover" and that, if Milani ever filed an internal complaint about disparate treatment, IBM would find a way to fire him. (Milani Dep. at 216; Milani Aff. ¶ 8) At some later date, a Hispanic colleague of Milani's was fired several weeks after complaining that IBM had subjected him to disparate treatment because of his ethnicity; IBM management referred to this employee as a "troublemaker", (Milani Aff. ¶ 10)

Shortly after starting work at IBM in 1985, Milani realized that his starting salary was approximately $50,000 below what other people at IBM with his qualifications were receiving. (*Id.* ¶ 9) Milani contacted Ms. Clark in IBM's human resources department about this disparity, and Clark raised the issue with Milani's Engineering Functional Manager, William Sheirich, and recommended that Milani be promoted to advisory engineer. (*Id.*) Sheirich then

---

**5.** An IBM document entitled "About Your Job", which was dated July 2000, described this policy as follows:

> 3.3.1.3 Dating Subordinates Prohibited
> A manager may not date or have a romantic relationship with an employee who reports through his or her management chain, even when the relationship is voluntary and welcome on the part of both the manager and the subordinate. This prohibition is necessary to preclude the appearance of favoritism, which would conflict with IBM's merit system. A manager who is romantically interested in a subordinate and wishes to pursue a dating relationship with that person (or continue or renew one that existed prior to the current reporting structure)

> must, in order to do so, either with or without his or her management's help, get himself or herself another job outside IBM, or with the subordinate's agreement, get the subordinate another job in IBM where that is needed to end the reporting relationship. The subordinate should be transferred only if he or she agrees to that solution.
> (Bloom Aff., Ex. 8 § 3.3.1.3)

**6.** The only evidence in the record of any age-based animus at IBM is Milani's recollection of an IBM manager once telling him that another employee was "very old, just here to have party, so we need to get rid of him." (Milani Dep. at 207)

reprimanded Milani for speaking to Clark and warned him not to do so again. (*Id.*) Sheirich did not promote Milani at that time, and he told Clark to warn Milani that "reporting such disparities in this manner would result in [Milani's] termination." (*Id.*) Shortly after Milani spoke to Clark about his salary, Clark told Milani that his national origin would prevent him from being promoted at IBM and that he was not eligible for promotions in IBM's infrastructure. (*Id.* ¶ 11) Milani did not believe Clark because he felt that IBM was true to its stated policy against discrimination. (*Id.*)

In 1985, Sheirich promoted a white [7] employee of unidentified national origin to staff engineer,[8] a position two levels higher than associate engineer, but the following year Sheirich agreed to promote Milani only one level, to senior associate engineer.[9] (Milani Dep. at 234–35) According to Milani, the promotion to senior associate engineer was "peanuts", and he should have received a promotion to staff engineer or an advisory position. (*Id.* at 235) In late 1986, Sheirich left IBM's Brooklyn office amid allegations of discriminatory conduct and was eventually replaced by Walter Federowicz, who was African-American; Federowicz never did or said anything that Milani considered discriminatory.[10] (*Id.* 239–40, 242–43; Milani Aff. ¶ 13)

---

**7.** According to IBM, Milani is also white. (*See* Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Ex. ¶ 25)

**8.** Although Milani testified at his deposition that Sheirich promoted this employee, Charlie Doyle, to staff engineer, he states in his affidavit that Sheirich actually promoted Doyle to advisory engineer. (Milani Aff. ¶ 12) Because Milani's affidavit conflicts with his earlier deposition testimony, this aspect of the affidavit is disregarded. *See Brown*, 257 at 252; *Raskin*, 125 F.3d at 63. Furthermore, it is apparent from Doyle's documented work history that he was promoted to staff engineer in 1985 and was not promoted to advisory engineer until 1991. (Pagan Aff., Ex. B, at 2–3)

**9.** Milani claims that he was more qualified and experienced than Doyle and stated that Doyle started working at IBM only a year before he did. (Milani Dep. at 233–34; Milani Aff. ¶ 12) However, Doyle's work history reveals that he first started working at IBM in 1980 as a junior engineer, was promoted to associate engineer—Milani's starting position—in 1982, and was promoted to staff engineer in 1985, after five years at IBM, two years as an associate engineer, and one year as a senior associate engineer. (Pagan Aff., Ex. B, at 2–3)

**10.** In his affidavit, Milani asserts:
Mr. Federowicz treated me with utter contempt. To begin, he frequently mentioned my national origin and even complained to me about other people at IBM of Arab descent. Also, he frequently would tell me that I was not in touch with IBM culture. I later learned that, even though I was approved for a transfer in or about January 1987, it was delayed because Mr. Federowicz refused to pass the information on to me.

(Milani Aff. ¶ 14) These new allegations completely contradict the following testimony, which Milani gave at his earlier deposition:

Q. Did [Federowicz] do anything that you considered discriminatory?

A. No. Actually, he tried to help me to move out of there, because I had had it so much that I couldn't stay there anymore, I wanted to run away.

Q. He agreed to transfer you elsewhere, didn't he?

A. Yes.

Q. Nothing he did indicated that he was biased against you because of your national origin, correct?

A. No. But he didn't also promote me, he just let me go from Brooklyn. I didn't stay long enough to make an opinion about how he would handle me if I stayed there longer.

(Milani Dep. at 242–43) Because the statements in Milani's affidavit are contradicted by his earlier deposition testimony, they are disregarded. *See Brown*, 257 at 252; *Raskin*, 125 F.3d at 63.

In 1987, Milani asked Jack Koehler, who was then Corporate Director of Manufacturing at IBM and later IBM President, what he needed to do to become a senior vice president at IBM. (Milani Dep. at 359–62) Koehler advised Milani to change his name from Ghasedi, which Koehler said was "very foreign sounding" and hard to pronounce. (*Id.* at 362–63; Milani Aff. ¶ 21) Koehler also pointed out that foreign nationals did not rise to the top at IBM and said that Milani would not be taken seriously as long as his last name was Ghasedi. (Milani Dep. at 362–63; Milani Aff. ¶ 21) In 1991 or 1992, Milani did change his last name from Ghasedi to Milani as a result of his conversation with Koehler. (Milani Dep. at 366–67; Milani Aff. ¶ 21) He chose "Milani" because his supervisor suggested it and because his supervisor and most other people in management in his IBM department were of Italian descent. (Milani Dep. at 368–69; Milani Aff. ¶ 21) Milani was not aware of anyone else at IBM who changed his or her name. (Milani Dep. at 370)

After he was transferred to IBM's Madison Avenue Office in 1987, Milani's new manager, Collette Alleva, did not assign him to the account for Columbia University, which was a major opportunity, and gave him the accounts for two universities that were thought to be undesirable assignments. (Milani Dep. at 249–50) Although Alleva never said anything to Milani that he found directly discriminatory, Milani contends that Alleva's decision may have been motivated by discrimination because "the language that they were using was basically you are not in the mainstream." (*Id.* at 251) However, by 1988, Milani was assigned to the team that worked on the Columbia University account. (*Id.* at 325)

In 1988, Milani worked on a team with two IBM marketing representatives who were of European descent; the marketing representatives were responsible for finding sales opportunities, and Milani would "close the deal" by presenting IBM's products from a technical perspective and providing technical support. (*Id.* at 318–19, 324; Milani Aff. ¶ 17) The team had a successful year and surpassed its sales quota, but Milani received no bonus, even though he believed he was entitled to a $140,000 bonus [11] and the marketing representatives each received substantial bonuses. (Milani Aff. ¶¶ 18–19; Milani Dep. at 319) Milani complained to Frank Jules, the branch manager who had decided not to give Milani a bonus, about the disparity in bonus payments and asked Jules to open an inquiry. (Milani Dep. at 327, 329, 332; Milani Aff. ¶ 20) Jules refused, telling Milani that he did not want IBM headquarters to think that he was not paying people fairly.[12] (Milani Dep. at 332) Milani once

---

[11] Milani claims that he was entitled to a $140,000 bonus under the sales plan that IBM had provided to him; this sales plan is not in the record. (Milani Aff. ¶ 19)

[12] In his affidavit, Milani states:

> Mr. Jules responded to me that he would not open an inquiry into the matter, and that raising such an issue might look bad for IBM.... Mr. Jules further advised me that I should not complain because such complaints would jeopardize his—and my—career at IBM.

(Milani Aff. ¶ 20) The allegation in this affidavit—that Jules worried that an inquiry into bonus structures would make *IBM* look bad—is contradicted by Milani's deposition testimony, in which he states that Jules was worried that an inquiry would make *Jules* look bad. At his deposition, Milani testified:

> [Jules] said it's not going to look good for him at IBM headquarters, which were monitoring the sales plan compensation, that he was not paying people fairly. And it wouldn't look good for him. So that's why he asked me to drop it.

(Milani Dep. at 332) Because Milani's affidavit conflicts with his earlier deposition testimony in this respect, it will be disregarded.

heard Jules make an "off-color" remark that some employees of other nationalities were not producing and were "just lazy". (*Id.*)

In 1989, Jules asked Milani to assist IBM with a project that required Milani to work an additional 30 hours per week. (Milani Aff. ¶ 22) Some unidentified person at IBM promised Milani that he would receive a promotion to senior systems engineer and a large bonus if the project was a success. (*Id.* ¶ 23) However, Milani received a bonus of only $2,000, even though the account representative on the project, who was of European descent, received a $20,000 bonus. (*Id.* ¶ 24; Milani Dep. at 344–45) Milani also never received the promotion to senior systems engineer that he had been promised, and instead the promotion went to a white employee of unidentified national origin.[13] (Milani Aff. ¶¶ 24–25) When Milani complained to someone at IBM about not getting the promotion, he was told not to compare himself to other employees, warned not to bring the matter to human resources, and informed that he would either keep his job or leave IBM and pursue the issue. (*Id.* ¶ 26)

Milani continued to be a valuable employee to IBM in the early 1990s, but despite his repeated requests, he was not promoted to a management position or moved to "area staff", which was a popular route for attaining a management position at IBM. (*Id.* ¶ 27; Milani Dep. at 353–54) By contrast, Milani's then-manager, Martin Hewitt, immediately moved an employee of Irish descent to "area staff" upon that employee's request.[14] (Milani Dep. at 354–55; Milani Aff. ¶ 28) Milani also claims that two other employees, whose national origins are not identified, received more favorable promotions and assignments in the early 1990s than he did.[15] (Milani Aff. ¶ 29) In particular, one of these employees was brought in from another department to work on the desirable Columbia University account, an assignment which Milani had requested and for which Milani believed himself better qualified. (*Id.* ¶ 30) Milani was told by some unidentified person that he should not go to human resources department to complain about such issues and that he should "never be seen" in the "corridors of human resources" unless he wanted to be labeled a troublemaker and treated adversely. (*Id.* ¶ 31)

*See Brown*, 257 at 252; *Raskin*, 125 F.3d at 63.

13. Milani believed that this employee, Vincent Micciantuono, was less qualified for the position than Milani because Micciantuono was less effective at marketing and less comfortable with the technical aspects of IBM products. (Milani Aff. ¶ 25) However, Micciantuono's work history reveals that he had been at IBM since 1981, four years longer than Milani, and had been an advisory systems engineer for more than four years at the time of his promotion in early 1989; Milani had only just been promoted to advisory systems engineer when Micciantuono was promoted to senior systems engineer. (Pagan Aff., Ex. C; Milani Dep. at 335–36)

14. According to Milani, this employee, Steve Howard, had "far less experience" at IBM than Milani. (Milani Aff. ¶ 28) However, there is no evidence in the record of Steve Howard's employment history.

15. The first employee, Kevin Hickey, began working at IBM in 1981 as an administrative account specialist and was promoted through various marketing positions until he became branch manager in 1991; Hickey and Milani never held the same position at the same time. (Pagan Aff., Exs. D, F) The second employee, Robert Fischetti, worked at IBM from 1988 to 1993, never held a higher position than Milani at any given time, and had a lower salary than Milani throughout his time at IBM. (Pagan Aff., Exs. E, F)

In 1993 or 1994, someone told Milani that joining the Higher Education team would allow him to be considered for a promotion to Band 10, also known as Level 60, which was the lowest level of management in IBM for the Higher Education department. (*Id.* ¶ 32) In 1995, Milani was promoted from his Band 8, Level 58 position to a Band 9, Level 59 position rather than to a Band 10, Level 60 position. (*Id.;* Pagan Aff., Ex. F) At the same time, Robert Barthelmes was promoted from Level 58 to Level 60 in one promotion, even though Barthelmes did not outperform Milani in sales and had only a bachelor's degree in business administration, as compared to Milani's Ph.D in mechanical engineering. (Milani Aff. ¶ 32; Barthelmes Dep. at 9) Barthelmes, who had worked at IBM in Massachusetts since graduating from college in 1983, was approximately eight years younger than Milani and of Irish origin. (Milani Aff. ¶ 32; Barthelmes Dep. at 7, 9) When Barthelmes was promoted, Milani discussed with him the fact that Milani had been passed over for the two-level promotion. (Milani Aff. ¶ 33) Barthelmes told Milani that he believed Milani had been overlooked because of his nationality and that IBM was making it impossible for Milani to get promoted because it did not give him assignments that would enable him to be considered eligible for a Band 10 promotion.[16] (*Id.*) Specifically, Barthelmes told Milani that he would never be promoted to Band 10 without a sales quota of at least $25 million; this requirement was not put in writing, and Milani was not promoted to Band 10 even though he reached the sales quota Barthelmes suggested. (*Id.*) Milani did not go to human resources about this issue because he feared retaliation and termination. (*Id.* ¶ 34)

In approximately 1996, Milani was asked to cover the Cornell University account for IBM, and some unidentified person at IBM promised him a promotion to Band 10 if he took over the account and produced positive results.[17] (*Id.* ¶ 35) Milani did produce positive results but still was not promoted to Band 10. (*Id.* ¶ 36)

In July 1999, Barthelmes became Milani's immediate supervisor, and he promised to promote Milani to Band 10. (*Id.* ¶ 38) Barthelmes never said anything to Milani that suggested prejudice against Milani because of age or national origin. (Milani Dep. at 179–80) However, Barthelmes never gave Milani the promised promotion to Band 10 or any substantial bonuses. (Milani Aff. ¶ 38)

C. *Milani's Relationship with Jolanta Schimenti*

In July 2000, a woman named Jolanta Schimenti struck up a conversation with Milani as they rode together on the train from New York to Connecticut. (Milani Dep. at 46–47; Milani Aff. ¶ 39) Both Milani and Schimenti were married at the time and living in Greenwich. (Milani Dep. at 46–48) Milani and Schimenti quickly became friends and talked whenever they saw each other on the train. (Milani Aff.

**16.** According to Barthelmes, he told Milani that the only reason Milani had not gotten promoted was the fact that he did not have a $25 million quota. (Barthelmes Dep. at 35–36) Because this testimony conflicts with Milani's affidavit, it must be disregarded for the purposes of this motion because conflicts in evidence must be resolved at this stage in favor of Milani.

**17.** According to Barthelmes, Milani asked to be assigned to the Cornell account in order to increase his quota to $25 million, and he was promoted shortly thereafter. (Barthelmes Dep. at 35–36, 79–80) Because this testimony conflicts with Milani's affidavit, it will be disregarded for the purposes of this motion because all inferences must be drawn in favor of Milani.

¶ 40) Over time, their relationship progressed to a close friendship that Milani sometimes described as "intimate", but they were never more than friends.[18] (*Id.* ¶¶ 40, 47; Milani Dep. at 48, 94)

Between July and September 2000, Milani and Schimenti met three or four times on the train ride, which lasted 45 or 50 minutes. (Milani Dep. at 49) They discussed the problems in their marriages; Milani told Schimenti that his marriage was "on the rocks", and Schimenti told Milani that she had married her husband only to get her green card. (*Id.* at 50) Milani and Schimenti talked about marrying each other, "but not very seriously," and they never said that they wanted to marry each other or that such a marriage would be a possibility.[19] (*Id.* at 59)

In August 2000, Schimenti told Milani that she was unhappy with her current employment and wanted to find a new job. (*Id.* at 159) Milani accompanied Schimenti to a job fair one evening after work. (*Id.* at 159–60) Schimenti also gave Milani a resume and cover letter to apply for a job at IBM, and Milani told her that he would pass it along to people at IBM. (*Id.* at 64–65) Milani attempted to have another manager at IBM review Schimenti's resume "because [he] knew, due to the fact that Ms. Schimenti and [he] did have a close friendship, if there was a way she could be placed with another manager, less potential problems could arise." (Milani Aff.

¶ 45) However, after looking at Schimenti's resume, the manager told Milani that she was not interested in hiring Schimenti. (Milani Dep. at 66)

At the time Schimenti gave Milani her resume, Milani had five people working for him, each of whom had technical training. (*Id.* at 69) Milani was in charge of filling two openings in his unit, one in New York City and one in Pennsylvania, that had been vacant since May. (*Id.* at 71, 158) These positions had previously been held by two senior people who had each worked at IBM for more than 20 years. (*Id.* at 71) According to Milani, he had hoped initially to find "somebody with extreme qualifications" who could act at an advisory level and did not need handholding. (*Id.*) Schimenti had no technical training and very limited knowledge of the computer industry, but she had some background in dealing with universities because she had been a literature professor in Lithuania. (*Id.* at 73) Milani also learned from Schimenti that she had the qualities of a customer-oriented salesperson and was well trained in management and customer relations. (Milani Aff. ¶ 41)

In August 2000, Milani showed Schimenti's resume to Barthelmes. (Milani Dep. at 78, 160–61) Barthelmes told Milani that they should try to find another candidate for the open position in New York because Schimenti did not have an appropriate level of sales experience.[20] (*Id.*; Barthelmes

18. Milani explains in his affidavit, "I deemed this relationship to be 'intimate' because, in my culture, a man shares his experiences with his wife only, and, thus, the information Ms. Schimenti and I were sharing with each other about our lives was, indeed, more intimate than any other friend I had at the time." (Milani Aff. ¶ 40)

19. This deposition testimony is not inconsistent with Milani's affidavit, in which he states, "I have never written any document, nor have

I ever stated orally, that I intended to marry Ms. Schimenti...." (Milani Aff. ¶ 49)

20. Milani states in his affidavit, "I reviewed [Schimenti's] resume with Barthelmes, and we both decided that we should look to hire other, more technically qualified, people before seriously considering her application." (Milani Aff. ¶ 43) Because Milani testified in his deposition that Barthelmes told him that they should look for a more qualified candidate, Milani's affidavit is disregarded insofar as it suggests that Milani was partly responsi-

Dep. at 86) Milani and Barthelmes were unable to find another candidate, and Milani again spoke to Barthelmes about Schimenti at the end of September. (Milani Dep. at 78, 161) This time, Barthelmes and Milani agreed that Schimenti could be considered by IBM. (Milani Aff. ¶ 44) Although Milani did tell Barthelmes that he knew Schimenti well and that they had a "close" relationship, at no point in the hiring process did Milani tell Barthelmes that he was involved in an intimate relationship with Schimenti or that he was concerned about a potential conflict arising because of that relationship. (Milani Dep. at 96, 98)

On October 17, 2000, Milani interviewed Schimenti for the open position in New York City. (Id. at 85) Although Milani and Schimenti did not have an intimate relationship when Schimenti first approached Milani about working at IBM, they were involved in an intimate relationship by late October 2000. (Id.) On October 20, 2000, Milani and Schimenti had a candid conversation about possible conflicts arising between their "intimate relationship" and the IBM business; on the same day, Milani prepared a handwritten note memorializing this conversation.[21] (Id. at 84–85, 161)

In November 2000, Milani and Barthelmes decided to hire Schimenti to work for Milani at IBM. (Id. at 62; Milani Aff. ¶ 46) Around the same time, Milani also hired Dr. David Yozzi, a former dean of administration at a Pennsylvania university, to fill the open position in Pennsylvania. (Milani Dep. at 72) According to Milani, Schimenti's qualifications were "not at all" comparable to Dr. Yozzi's. (Id. at 73) Furthermore, Schimenti's command of English was not uniformly good; she did not have the ability to communicate concepts or write them in a format that could be understood in the IT industry, abilities that were important for the job. (Id. at 75)

Milani assigned Schimenti to work on accounts for St. John's University, City University of New York, and Polytechnic University. (Id. at 112) Apart from Schimenti, all of Milani's employees went on at least some sales calls by themselves. (Id. at 132) By contrast, Milani accompanied Schimenti on all customer calls, and Schimenti did not talk with customers and was not able to answer technical questions or make independent presentations. (Id. at 113, 166)

In December 2000, Milani and his wife decided to separate, and Milani filed a petition for divorce on the ground that the marriage had broken down irretrievably. (Id. at 292–93; Milani Aff. ¶ 51; Bloom Aff., Ex. 12) Milani moved out of his house in Connecticut and rented an apartment in Larchmont; he furnished the apartment minimally and purchased a few necessary pieces. (Milani Dep. at 59–60, 162–63) Schimenti offered to help Milani buy furniture, but Milani refused her offer.[22] (Id. at 61)

---

ble for the decision to seek more qualified applicants. *See Brown,* 257 at 252; *Raskin,* 125 F.3d at 63.

**21.** The note reads as follows:

Fri. Oct. 20, 2000
Ref: Jolanta Schimenti working for me at IBM I had a candid conversation with Jolanta regarding conflicts of our intimate relationship with IBM business. I told her "If any sign of conflict arises I will try to find her a job in another part of IBM or she will have to find a job outside of IBM." She agreed to this and said "If any conflict arises regardless of its nature she will leave IBM immediately since I have had such a long history with IBM and she will not let that be jeopardized."
I hope all will work as we all agreed here on this day. H.M. 10/20/2000
(Bloom Aff., Ex. 10)

**22.** Although Schimenti testified at her deposition that she went shopping for furniture with Milani at Huffman Koos (Bloom Aff., Ex. 13

In late December 2000, Schimenti bought Milani a $300 scarf as a New Year's present; Milani told Schimenti that it was not appropriate for him, an IBM manager, to accept such a gift, but Schimenti insisted on giving him the scarf as a friend. (*Id.* at 307) As a way of returning the money Schimenti had spent on the scarf, Milani gave Schimenti a Gucci watch that cost $300 to $400. (*Id.*)

IBM's human resources department told Milani to evaluate Schimenti and Dr. Yozzi at the end of 2000, even though they had only worked at IBM for one and a half months. (*Id.* at 108) Milani objected, saying that he could not reasonably evaluate someone after such a short time, but IBM insisted. (*Id.*) Milani gave Schimenti and Dr. Yozzi each a "3" on their evaluations, which meant that they had met their requirements. (*Id.* at 109; Bloom Aff., Ex. 15) In his evaluation of Schimenti, Milani wrote that Schimenti's behaviors and skills met or exceeded expectations, based on her having set up calls, arranged meetings, and done other tasks he had asked her to do. (Milani Dep. at 117–18; Bloom Aff., Ex. 15) At the end of the evaluation, Milani wrote, "Jolanta is on track to learn the IBM product and service deliveries.... I look forward to working with her on my team in the coming year." (Milani Dep. at 118; Bloom Aff., Ex. 15)

Milani asked Schimenti to pursue several training opportunities, which he was entitled to do as her supervisor, but Schimenti refused to participate in any training programs. (Milani Dep. at 122) In or about January 2001, Milani gave Schimenti a 30–page document to read about IBM products; Schimenti told Milani that she did not understand it. (*Id.* at 123) Milani said at his deposition, "That's when a flag started going up in my mind that not only this person doesn't have technical background, but she doesn't even have the aptitude...." (*Id.*) According to Milani, "it was becoming clearer and clearer that Ms. Schimenti was not qualified, in the slightest manner, to complete her duties at IBM," in part because she could not understand technical information about IBM's products. (Milani Aff. ¶¶ 54–55)

In February 2001, Milani and Schimenti both attended a meeting with the entire team for the Northeast region. (Milani Dep. at 135) At the meeting, each sales representative was supposed to explain what she did and what she brought to the team. (*Id.*) When it was Schimenti's turn, she said that she was very happy to be at IBM but that she did not have anything to contribute at that point; she further stated that it would take her, at minimum, two years to provide any meaningful value to anybody else. (*Id.* at 136; Milani Aff. ¶ 56) Based on this disclosure, it was obvious to Milani and Barthelmes that Schimenti was not working out for the department and needed to be replaced. (Milani Aff. ¶ 57) Milani approached Schimenti about her performance and her statement at the meeting, and he told her that she

("Schimenti Dep.") at 171), Milani maintains that he shopped for furniture alone. (Milani Dep. at 61; Milani Aff. ¶ 53) Schimenti's deposition testimony is also inconsistent with Milani's version of events in several other respects. According to Schimenti, she and Milani had sex in the Larchmont apartment multiple times between December 2000 and the beginning of February 2001, although they had not had sex before that time. (Schimenti Dep. at 40–43) Schimenti claims also

that Milani brought her to the Stamford courthouse several times to file for divorce from her husband, but Schimenti refused to do so. (*Id.* at 80–81) According to Schimenti, Milani told her many times that he loved her and wanted to marry her. (*Id.* at 165) Because all of this testimony is contradicted by Milani's testimony, and because all conflicts must be resolved in favor of Milani for the purposes of this motion, Schimenti's description of their relationship is disregarded.

should begin thinking about other employment. (*Id.* ¶ 58) Schimenti became upset and threatened to sue IBM, stating that she would allege that Milani had sexually harassed her. (*Id.* ¶ 59) On February 13, 2001, Milani memorialized this conversation in another handwritten note. (Milani Dep. at 135; Bloom Aff., Ex. 17)

On February 21, 2001, Milani and his wife withdrew their divorce papers, and Milani began making plans to return home. (Milani Aff. ¶ 60) According to Milani, Schimenti made accusations of sexual harassment against two other IBM employees, claiming that Daniel White, who was African–American, was continually asked her out and that Peter Lindner, who was white and of unspecified national origin, had given her his desk key, but IBM did not follow up on Schimenti's complaints.[23] (*Id.* ¶ 62)

In March 2001, Barthelmes and Milani agreed that Schimenti would probably be laid off. (*Id.* ¶ 63) At that point, Milani's relationship with Schimenti had deteriorated, and they were no longer close. (*Id.*)

23. According to Schimenti, she never had a problem with the way that White or Lindner treated her, and she never complained about them. (Reply Affirmation of Allan S. Bloom, Ex. C at 69) Because this testimony conflicts with Milani's account, and conflicts must be resolved in Milani's favor, it will be disregarded for the purposes of this motion.

24. Milani states in his affidavit that Schimenti "never accompanied me into my apartment for any reason" (Milani Aff. ¶ 52); because this statement is contradicted by Milani's deposition testimony, in which he said that Schimenti had visited his apartment once in March 2001, this affidavit statement will be disregarded. *See Brown,* 257 at 252; *Raskin,* 125 F.3d at 63.

25. That evening, Schimenti's husband John called the Greenwich police to report a series of anonymous telephone calls to the Schimenti home. (Bloom Aff., Ex. 20 ("Police Report") at 3) The caller hung up when John

However, on March 14, 2001, Schimenti dropped by Milani's Larchmont apartment before work to give him some books, including her childhood dictionary, that she had brought back from her recent trip to Lithuania.[24] (Milani Dep at 168; Pagan Aff., Ex. M ("Berthold Report") at 3)

On March 16, 2001, while they were in Milani's office, Schimenti told Milani that she had been sexually involved with a married man during her recent trip to Lithuania. (Milani Dep. at 171; Berthold Report at 3) During the same conversation, Milani told Schimenti that he was making arrangements to give up his Larchmont apartment and move back in with his wife and children. (Milani Dep. at 171; Milani Aff. ¶ 64) Schimenti became extremely upset upon hearing this news, and she stormed out of Milani's office. (Milani Dep. at 172; Milani Aff. ¶ 64) Milani was concerned about Schimenti and attempted unsuccessfully to contact her by pager and telephone to check on her welfare.[25] (Milani Dep. at 172; Milani Aff. ¶ 65)

Schimenti answered the telephone the first three times; on the fourth call, a male voice stated that he knew John Schimenti's father and had information about his wife. (*Id.*) John Schimenti told Officer Kristopher Shockley, who arrived to investigate the case, that the only person who might harass them was a male coworker of Jolanta Schimenti's at IBM who had sought unsuccessfully to date her. (*Id.*)

On April 6, 2001, John Schimenti called Officer Shockley and told him that he believed the harassing telephone calls were coming from the Milani residence and that he believed Milani was angry at his wife for filing a sexual harassment charge against him. (*Id.* at 5) Officer Shockley interviewed Milani and his wife the same day and asked them whether they had made any harassing calls. (*Id.;* Milani Aff. ¶ 73) Milani denied making the calls, and he might have told Officer Shockley that he had an "intimate relationship" with Schimenti; however, he never said that he and Schimenti had an affair or that his wife

Schimenti never returned to work after March 16, 2001. (Milani Aff. ¶ 66) Milani tried to reach her the following week, and on March 20, 2001, Schimenti sent him an e-mail indicating that she believed she was in some kind of danger. (*Id.* ¶ 67) Milani then called human resources specialist Denigal Boykin, explained that Schimenti apparently planned never to return to IBM, and stated that he and Barthelmes considered Schimenti a candidate for lay-off in light of her declining performance. (*Id.* ¶ 68) On March 22, 2001, Schimenti sent an e-mail to Milani and Barthelmes, stating that she was in "professional care". (*Id.* ¶ 69)

On March 26, 2001, at 4:00 p.m., Milani received a call from William Brewer, who identified himself as Schimenti's attorney. (*Id.* ¶ 70; Milani Dep. at 176) Brewer told Milani that Schimenti was afraid of losing her job and believed that Milani had sexually harassed her.[26] (Milani Aff. ¶ 70) Milani immediately called Barthelmes and told him about the call, and that evening the two of them met privately at a restaurant in Grand Central Station to discuss the matter. (Milani Dep. at 176–77; Milani Aff. ¶ 71) Milani told Barthelmes that he had a "close, intimate relationship" with Schimeti and that he had "shared with her things that [he] should not probably have done as a manager, to get that close to an employee and tell her about [his] personal life." (Milani Dep. at 177) However, Milani never told Barthelmes that he had a romantic, sexual, or physical relationship with Schimenti.[27] (*Id.* at 157, 177–78; Milani Aff. ¶ 71) At the end of the conversation, Barthelmes told Milani to get a lawyer and said that he would be reporting the situation to his supervisor Marianne Cooper the following day; Milani said that he understood. (Barthelmes Dep. at 126–27)

On the morning of March 27, 2001, Barthelmes went to Cooper and told her that Milani had had an "intimate relationship" with Schimenti. (Barthelmes Dep. at 128) Cooper called human resources and the legal department to come down to review the conversation Barthelmes and Milani had had the night before. (*Id.*) Also on March 27, 2001, Milani contacted Boykin to discuss the conversation he had had with Brewer the previous day. (Milani Dep. at 180) Milani told Boykin that he

---

"found out" about Schimenti, and he does not recall saying that he and his wife were in the process of divorce. (Milani Dep. at 454–57; Milani Aff. ¶ 73)

By contrast, Officer Shockley wrote in his report that Milani told him the following: "that he and Golanta Schimenti had been having an affair for the past few months. That his wife found out about the affair and it was ended a short while later. That he did not make any harassing calls to the Schimenti residence and he does not know who would. That he has hired an attorney and is in the process of a divorce. That he does not want any problems with Golanta Schimenti." (Police Report at 5)

**26.** Also on March 26, 2001, John Schimenti sent an e-mail to Milani's work e-mail account, copying Brewer on the message, in which he stated in part, "I am writing in order that you stop your constant phone calls, voice mails and other harassments." (Bloom Aff., Ex. 19) The next day, Milani forwarded this message to Boykin and to Leigh Meaders, who worked in IBM's legal department. (*Id.*) Milani never made any harassing calls to the Schimenti house; "[t]he only phone calls [he] ever made to Ms. Schimenti's residence were for the purpose of locating her, and discussing whether she would be returning to work." (Milani Aff. ¶ 72)

**27.** According to Barthelmes, Milani told him that he and Schimenti had gone to hotels and to his apartment. (Barthelmes Dep. at 126) Barthelmes also claims that Milani told him that he had saved the bed sheets and then made a joke about Monica Lewinsky. (*Id.*) Because this testimony conflicts with Milani's testimony, it will be disregarded for the purposes of this motion because all inferences must be drawn in favor of Milani.

and Schimenti had a "close, intimate relationship." (*Id.* at 180–81) Boykin told Milani that because Schimenti had an attorney, an IBM attorney needed to become involved. (Berthold Dep. at 67) Boykin never made a comment about Milani's national origin in Milani's presence, but Milani claims that Boykin's responsiveness to him was "very, very different" from his responsiveness to other non-Iranian managers. (Milani Dep. at 184)

### D. *IBM's Investigation of Milani*

In late March or early April 2001, Boykin telephoned IBM human resources partner Carol Berthold and asked her to do an open-door investigation[28] of Milani. (Pagan Aff., Ex. L ("Berthold Dep.") at 8, 17–18) Boykin told Berthold that Milani appeared to be having an affair with Schimenti, one of his employees. (*Id.* at 18) Berthold had never heard of Milani or Schimenti before this conversation. (*Id.* at 17–19) Berthold began her open-door investigation the day after her conversation with Boykin by making a list of people to interview: Milani, Barthelmes, Boykin, and Schimenti. (*Id.* at 21)

Berthold's first interview was with Milani in the human resources conference room. (*Id.* at 23) Milani had never met Berthold or had any business dealings with her before the investigation. (Milani Dep. at 139) Berthold told Milani that she had been assigned to investigate his case, but did not describe the case to him, and she never said that it involved either sexual harassment charges or an affair with a subordinate. (Berthold Dep. at 24–27) Milani believed that Berthold's investigation related to Schimenti's threatened sexual harassment charges, and Berthold never told him that she was actually investigation him and his conduct with Schimenti. (Milani Aff. ¶ 75) Milani told Berthold that he believed Schimenti was claiming that he sexually harassed her, and he asked Berthold what the precise allegations against him were and whether he needed an attorney. (Milani Dep. at 144–45; Berthold Dep. at 27) Berthold told Milani that she did not know and that he did not need an attorney because, as a manager, the IBM legal department would represent him. (Milani Dep. at 144) Berthold told Milani that he should work with her so that they could dismiss Schimenti's charges, and she said that IBM would protect him. (*Id.* at 189) At no point in her investigation did Berthold say or do anything to Milani that suggested prejudice based on age or national origin. (*Id.* at 165–66)

This first meeting between Berthold and Milani lasted one to two hours. (Berthold Dep. at 29) Milani told Berthold that he had a close, intimate relationship with Schimenti; he may have also described the relationship as "consensual", but he never used the terms "romantic" or "sexual", and he never told Berthold that he had had an affair with Schimenti.[29] (Milani Dep. at 91, 157; Milani Aff. ¶ 76) Milani told Berthold that he was separated from his wife and had rented a new apartment, but he

---

28. When conducting an open-door investigation, the investigator first seeks to understand the facts and then makes a list of whom to interview. (Pagan Aff., Ex. L ("Berthold Dep.") at 14) At the conclusion of the investigation, the investigator makes a recommendation, which may or may not be accepted. (*See id.* at 50) Findings made pursuant to an open-door investigation may be appealed. (*Id.* at 77)

29. According to Berthold, Milani described to her how his relationship with Schimenti had grown from friendship into love. (Berthold Dep. at 30–31) Berthold also claims that Milani told her that he had bed sheets which proved that the relationship was consensual. (*Id.* at 32) Because Berthold's memory of the conversation differs from Milani's, Milani's must control for the purposes of this motion.

never said that he and Schimenti were planning to move in with each other. (Milani Aff. ¶¶ 76–77) Milani told Berthold about the circumstances surrounding Schimenti's hiring and explained that he and Barthelmes had agreed to hire her. (*Id.* ¶ 78) Berthold repeatedly assured Milani that his position at IBM was safe and that IBM's legal department would protect his rights. (*Id.* ¶ 80) Berthold never asked Milani if he had had sex with Schimenti or had otherwise been physical with her. (*Id.* ¶ 81) Milani also met with Berthold a second time and gave her the books from Lithuania that Schimenti had given him. (Milani Dep. at 142) In addition, Milani gave Berthold the note he had written on October 20, 2000, that memorialized his concerns about a possible conflict between his "intimate relationship" with Schimenti and his work at IBM. (*Id.* at 150; Bloom Aff., Ex. 10) Throughout the course of her investigation, Berthold spoke to Milani either in person or on the telephone five to six times. (Berthold Dep. at 28)

Berthold also talked to Barthelmes after she interviewed Milani. (*Id.* at 39) Barthelmes told her that Milani had confessed to him that he was having an affair with Schimenti. (*Id.* at 41) In a later conversation, Barthelmes told Berthold that he had not initially approved of hiring Schimenti but had relented because of customer demand and because he believed a second manager had also interviewed Schimenti. (*Id.* at 41–42) During the course of her investigation, Berthold concluded that it had been improper to hire Schimenti because Schimenti had no skills, and she believed that Milani should have been disciplined for hiring her, although she was not aware of an IBM policy that allowed an employee to be disciplined for making an improper hiring decision. (*Id.* at 42–43) Berthold never spoke to Schimenti during the investigation because Schimenti, who had not returned to work, did not make

herself available for an interview. (*Id.* at 46–47)

On April 23, 2001, Milani sent an e-mail to Meaders, the IBM legal representative with whom Milani had previously discussed his case. (Milani Dep. at 147–48) Milani's e-mail to Meaders included the following:

My attorney told Mr. Brewer, that this is a consensual relationship gone bad and has nothing to do with sexual harassment. My attorney told Mr. Brewer that we have ample evidence to prove that there has been mutually consensual relationship between the two which goes back to July 2000 . . . .

Carol [Berthold] informed me that Mr. Brewer has changed the charges now, obviously she had to confess the mutually consensual relationship in the face of overwhelming evidences, and now are claiming that I did not want to stop the relationship when she wanted to—Another lie which I completely covered with Carol Berthold. You have seen Carol's final report . . . .

Also, my wife, we have been formally separated since Dec 2000, had a meeting with Jolanta Schimenti's father in law, over a week ago, he said to my wife that "Jolanta Schimenti has admitted to another extra marital affair with someone other than your husband at the same time she was having one with your husband." I believe I conveyed this to Carol Berthold, but wanted to make sure you have made note of that in your defense (possibly character angle, etc.)
. . .

(Bloom Aff., Ex. 9) At his deposition, Milani explained that he used the term "consensual relationship" in the e-mail because he "meant mutual relationship, meaning that it was not something that [he] was forcing on her or harassing her for any favor in return for job or anything." (Mi-

lani Dep. at 149–50) Milani's evidence of a consensual relationship included the books Schimenti had given him, as well as a postcard she had given him on his birthday which contained some spiritual Buddhist writing. (*Id.* at 150–51)

On April 24, 2001, Berthold prepared a report for IBM, which was not shown to Milani until his deposition. (*Id.* at 146–47) In this report, Berthold summarized her findings in the case. (*See* Berthold Report at 1–5) She characterized Milani's relationship with Schimenti as "romantic involvement" and stated that Milani and Schimenti had planned to marry. (*Id.* at 2) At the end of the report, Berthold concluded that Milani had violated IBM's Business Conduct Guidelines by engaging in a romantic relationship with Schimenti, his subordinate, and that his behavior "adversely affected his role as an IBM Manager and IBM's legitimate business interests by compr[om]ising the manager/employee relationship." (*Id.* at 5–6) Although Berthold found that Milani had not harassed Schimenti, she did conclude that he had engaged in inappropriate behavior with her and had violated IBM's employment policies and practices. (*Id.* at 6) Berthold wrote, "By Mr. Milani's own admission, he hired a woman with whom he was romantically involved and continued the relationship while she was employed at IBM and she reported to him." (*Id.*) Berthold stated that Milani's behavior had put IBM at financial risk if sexual harassment charges were filed, and she noted that Milani "arguably" hired a woman who was not qualified to work in a sales position at IBM. (*Id.*)

At the end of the report, Berthold made the following recommendation: "Because of the fact that Mr. Milani violated IBM's Business Conduct Guidelines and IBM's employment policies and practices, it is recommended that IBM Management terminate Mr. Milani's employment with the IBM Corporation with no separation pay." (*Id.*) In some of her past open door investigations, Berthold had recommended that an employee be removed from IBM management, but with Milani, she recommended termination because she believed that Milani had engaged in "gross, gross misconduct." (Berthold Dep. at 50–51)

Berthold reviewed this report with her manager and with Meaders. (*Id.* at 71) In the discussion with her manager, Berthold mentioned alternatives to termination, but Berthold's manager supported Berthold's recommendations. (*Id.* at 72) Berthold never spoke to anyone about whether Schimenti was going to be disciplined, and she never discussed the findings of her investigation with Milani. (*Id.* at 77–78)

Berthold's report was reviewed with Cooper and Barthelmes. (Cooper Dep. at 41) Based on Berthold's recommendation, Cooper and Barthelmes decided that Milani should be fired. (*Id.* at 41–44) Cooper cannot recall ever encountering another situation where an employee was romantically involved with another employee. (*Id.* at 42–43) Apart from Milani, Cooper also does not remember Human Resources ever recommending that an employee be fired. (*Id.* at 63–64)

On April 25, 2001, Barthelmes informed Milani that he was terminated for violating IBM's Business Conduct Guidelines and told him that he could appeal the decision. (Milani Aff. ¶ 82; Barthelmes Dep. at 143–44) However, Milani was never allowed to appeal the recommendation of Berthold's open-door investigation.[30] (Milani Aff. ¶ 83)

---

**30.** According to Berthold, she learned that Milani did appeal the outcome of the open-

door investigation because Anthony Scales, who was reviewing the investigation, called

## E. *Procedural History*

On May 1, 2002, Milani filed a summons in this case. (Bloom Aff., Ex. 2) This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332 (2000) because the parties are citizens of different states and the matter in controversy exceeds $75,000.

## II.

■ Milani's claims are subject to a three-year statute of limitations. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (statute of limitations for NYSHRL); *Kent v. Papert Companies, Inc.*, 309 A.D.2d 234, 240, 764 N.Y.S.2d 675, 679 (1st Dep't 2003) (statute of limitations for NYSHRL and NYCHRL). "[A]n employment discrimination claim accrues on the date that an adverse employment determination is made and communicated to the plaintiff." *Cordone v. Wilens & Baker, P.C.*, 286 A.D.2d 597, 598, 730 N.Y.S.2d 89, 90 (1st Dep't 2001) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). Accordingly, a plaintiff must institute a civil action by service, delivery, or filing of a summons within three years of learning of the adverse employment determination on which that claim is based. *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 306, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (explaining that civil action is commenced by service, delivery, or filing of summons, not by filing of complaint). Because the summons in this case was filed on May 1, 2002, (Bloom Aff., Ex. 2), Milani is time-barred from asserting in this case any claims that accrued before May 1, 1999.

Milani acknowledges that many of the allegedly discriminatory incidents listed in his complaint occurred more than three years before he instituted this action, but he argues that he should be allowed to assert claims based on these acts for three reasons. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.Memo.") at 24–25) First, Milani claims that IBM subjected him to a "systematic pattern and practice of discrimination," which means that acts occurring outside the statute of limitations should be actionable because they are part of a continuing violation. (*Id.* at 24–26) Second, Milani claims that he did not learn about IBM's discriminatory employment decisions until some unspecified recent date, which means that his claims accrued after May 1, 1999. (*Id.* at 28–29) Third, Milani argues that IBM should be equitably estopped to assert a statute of limitations defense because it deceived him into believing that he was not a victim of discrimination and because it discouraged him from filing discrimination complaints.[31] (*Id.* at 26–27) Because, for reasons described below, Milani's three arguments are unpersuasive, he may not bring claims based on the incidents of alleged disparate treatment that occurred before May 1, 1999.

---

her with questions about her report; Milani did not prevail on his appeal. (Berthold Dep. at 78–80) Berthold claims that Milani is the only employee who ever appealed one of her open-door investigations. (*Id.* at 82) Because Berthold's testimony conflicts with Milani's, Berthold's testimony is disregarded.

**31.** Although Milani uses the term "equitable tolling" in his brief, "New York appears to use the label 'equitable estoppel' to cover both the circumstances where the defendant conceals from the plaintiff the fact that he has a cause of action and where the plaintiff is aware of his cause of action, but the defendant induces him to forgo suit until after the period of limitations has expired." *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) (internal quotation marks and brackets omitted). Because these are the circumstances Milani alleges here, his arguments in favor of "equitable tolling" will be analyzed under New York's law of equitable estoppel.

## A. Pattern and Practice / Continuing Violation

Milani argues first that IBM engaged in a pattern and practice of discrimination and that all of the incidents about which he complains resulted from this pattern and practice. (Pl. Memo. at 24–26) Based on this "pattern and practice" theory, Milani argues that these incidents should all be considered part of one "continuing violation" by IBM, which in turn would entitle him to bring a cause of action based on the acts that occurred before May 1, 1999. (*Id.* at 25)

To the extent Milani claims that discrete incidents of discrimination, taken together, can be considered a continuing violation, this argument is foreclosed by *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).[32] In *Morgan,* the Supreme Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[33] *Id.* at 113, 122 S.Ct. 2061. Instead, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," *id.,* and even serial violations—a series of discrete but related acts of discrimination—do not warrant application of the continuing violations doctrine. *Id.* at 114, 122 S.Ct. 2061. Here, Milani complains about three types of discriminatory incidents that occurred before May 1, 1999: failures to promote, failures to compensate adequately, and de-

nials of preferred job assignments. (*See* Compl. ¶¶ 6, 11, 13–15, 17, 19–23) Each of these incidents is properly considered a discrete discriminatory act that is subject to its own statute of limitations. *See Morgan,* 536 U.S. at 114, 122 S.Ct. 2061 (describing "failure to promote" as a discrete act); *Gross v. Nat'l Broad. Co., Inc.,* 232 F.Supp.2d 58, 68 (S.D.N.Y.2002) ("The holding in *Morgan* is in accord with Second Circuit law which states that alleged failures to compensate adequately, transfers, job assignments and promotions cannot form the basis for a continuing violation claim."); *Kent,* 309 A.D.2d at 240, 764 N.Y.S.2d at 680 (explaining that, in case of discriminatory pay, each paycheck is the basis for a separate cause of action that is subject to its own limitations period).

■ Although he alleges only discrete discriminatory acts, Milani argues that claims based on all of these incidents should be considered timely because the incidents are connected by a pattern and practice of discrimination at IBM. (Pl. Memo. at 25) Although it is true that the Supreme Court's holding in *Morgan* did not extend to "pattern-or-practice" claims, 536 U.S. at 115 n. 9, 122 S.Ct. 2061, Milani has neither alleged nor produced evidence to support a such a claim. "To succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defen-

**32.** Although *Morgan* involved Title VII claims, its holding about continuing violations applies also NYSHRL and NYCHRL claims. *See Staff v. Pall,* 233 F.Supp.2d 516, 527–28 (S.D.N.Y.2002), *aff'd* 76 Fed.Appx. 366 (2d Cir.2003) (concluding that the reasoning of *Morgan* with respect to the continuing violation exception applies also to NYSHRL claims); *Flaherty v. Metromail Corp.,* 293 F.Supp.2d 355, 358–59 (S.D.N.Y.2003) (applying *Morgan* to NYSHRL and NYCHRL claims).

**33.** By contrast, a plaintiff bringing a hostile work environment claim, which involves repeated conduct and multiple incidents of harassment, may base his claim on acts that occurred outside the statute of limitations so long as some of the conduct occurred within the statute of limitations. *See Morgan,* 536 U.S. at 115–17, 122 S.Ct. 2061.

dant's 'standard operating procedure.' " [34] *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 158 (2d Cir.2001) (citing *Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Here, Milani argues only that he was subjected to what he terms a "pattern and practice of discrimination," based on repeated incidents of discrimination and IBM's repeated warnings to him about complaining to human resources. (*See* Pl. Memo. at 25–26) Although Milani suggests in a conclusory fashion that these incidents resulted from systematic discrimination at IBM based on national origin and age, he does not identify, describe, or provide any evidence of a discriminatory policy or practice underlying IBM's discrete acts. Milani "may not ... convert discrete acts into a pattern or practice merely by invoking those words," and absent any allegation or evidence that IBM employed a discriminatory policy or practice in a systematic way, Milani cannot convert a series of discrete acts into a pattern or practice of discrimination. *Timothy v. Our Lady of Mercy Med. Ctr.,* No. 03 Civ. 3556(RCC), 2004 WL 503760, at *3 (S.D.N.Y. Mar.12, 2004).

Instead, Milani's claims are based on discrete acts of discrimination, each of which is subject to its own three-year limitations period. Because the statute of limitations has therefore run on each discrete act that Milani knew about before May 1, 1999, Milani may assert claims based on acts that occurred before that date only if he can show either that he learned about the acts after May 1, 1999, or that the doctrine of equitable estoppel applies.

## B. *Accrual of Claims*

■ Milani next argues that his claims based on each discrete act of discrimination did not accrue until after May 1, 1999, because he did not discover IBM's over-all discriminatory intent until after that date. (Pl. Memo. at 28–29) Milani cites no law to support his contention that a discrimination claim accrues only when the plaintiff knows, or should know, enough "critical facts" about the defendant's discriminatory motives to file a claim.[35] (*See id.*) Indeed, "[i]t is settled that an employment discrimination claim accrues on the date that an adverse employment determination is made and communicated to the plaintiff." *Cordone,* 286 A.D.2d at 598, 730 N.Y.S.2d at 90 (citing *Ricks,* 449 U.S. at 258, 101 S.Ct. 498).

Even assuming *arguendo* that Milani's interpretation of the law is correct and that his claims did not accrue until he first discovered IBM's discriminatory intent, Milani has produced no evidence to support his claim that he discovered critical information after May 1, 1999, which revealed that IBM's treatment of him before that date was motivated by discrimination. Although Milani claims that he did not realize the full extent of IBM's discriminatory policies until Cooper's deposition testimony (Pl. Memo. at 28), Cooper's statements could not have been critical to Milani's decision to institute this action because her deposition necessarily

---

**34.** It is by no means clear that a private plaintiff can even bring a "pattern-or-practice" claim in a non-class action complaint. *See Blake v. Bronx Lebanon Hosp. Ctr.,* No. 02 Civ. 3827(CBM), 2003 WL 21910867, at *5 (S.D.N.Y. Aug.11, 2003) (collecting cases).

**35.** Milani does cite *Kronisch v. United States,* 150 F.3d 112 (2d Cir.1998) for the proposition that "a claim will accrue when the plain-

tiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Id.* at 121. However, *Kronisch* was discussing the "diligence-discovery rule of accrual" in connection with the Federal Tort Claims Act. *Id.* Milani cites no cases that apply this principle to employment discrimination claims.

occurred after Milani was already pursuing his claims.

Milani has not identified any other information that he learned after May 1, 1999, that related to events occurring before that date. (*See id.* at 28–29) Instead, Milani asserts that, "[u]pon reflection, of course, he now realizes that IBM would never have allowed him to advance beyond Band 9," (*id.* at 28) but he provides no information about what led him to this realization. Because Milani has not identified a single fact that he learned between May 1, 1999, and May 1, 2002, that would have enabled him to discover discriminatory intent behind IBM's earlier actions, he has provided no evidentiary support for his assertion that he first discovered IBM's prior discriminatory intent during that period. Because Milani learned nothing new about actions taken by IBM before May 1, 1999, during the three years after that date, he cannot show that claims based on those actions accrued on or after May 1, 1999. These claims therefore accrued before May 1, 1999, and are now barred by the three-year statute of limitations.

## C.  *Equitable Estoppel*

In anticipation of the possibility that this court would reject his "pattern-or-practice" and accrual arguments, Milani presents two reasons why defendant should be equitably estopped to assert a statute of limitations defense for the discrete acts that occurred before May 1, 1999. First, Milani contends that IBM deceived him into believing that he was not advancing because of its internal restrictions on advancement, which in turn prevented him from discovering any of IBM's pre–1999 discrimination in time to file a timely claim. (Pl. Memo. at 26–27) Second, Milani suggests that IBM discouraged him from complaining about any mistreatment by warning him that complaints to human

resources would hinder, rather than assist, his advancement within the company. (*Id.* at 27) Because neither of these arguments supports the application of equitable estoppel here, Milani cannot prevent IBM from successfully invoking a statute of limitations defense in this case.

■ Milani's first attempt to invoke equitable estoppel fails because he has produced no evidence to show that IBM did anything to deceive him about its allegedly discriminatory motives. "Under New York law, ... a party may be estopped from raising a statute of limitations defense where his fraud, concealment, or deception prevented the plaintiff from timely filing his claim." *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 942 (2d Cir.1998) (citing *Simcuski v. Saeli*, 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713 (1978)). Equitable estoppel is appropriate only if the plaintiff demonstrates that he acted with due diligence by bringing his claim "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir.1995) (quoting *Simcuski*, 44 N.Y.2d at 450, 406 N.Y.S.2d at 263, 377 N.E.2d 713).

Here, Milani identifies only two specific acts of deception by IBM, both of which involve allegedly misleading Milani into believing that a Band 10 promotion required qualifications other than those it actually did. The first such act is Barthelmes's statement in 1995 that Milani would never be promoted unless he achieved a $25 million quota, a statement that was later contradicted by Cooper's deposition testimony. (Pl. Memo. at 27) However, during the same conversation, Barthelmes also told Milani that IBM had passed him over for a Band 10 promotion because of his nationality. (Milani Aff. ¶ 33) Having cited this revelation, Milani cannot argue that

Barthelmes was trying to deceive him about IBM's discriminatory motives during this 1995 conversation, and he cannot invoke this conversation as an instance of IBM's deception.

Milani next claims that "IBM tricked [him] into believing that he could take the Harvard Business course without completing the 'project' and still be eligible for a promotion to [Band 10]" because IBM promoted Barthelmes to Band 10 even though he had not completed the project. (Pl. Memo. at 27) Assuming *arguendo* that IBM's actions here were misleading, Milani does not explain how this false information about the Harvard course requirement could have led him to believe that IBM was not discriminating against him. Indeed, IBM's failure to promote Milani should have appeared more suspect to Milani, not less, if he believed incorrectly that he had fulfilled all of the requirements for Band 10. Because Milani does not explain how he, or any reasonable person, could conclude that this incident made IBM's failure to promote him appear less likely to be motivated by discrimination, any misleading information about the project requirement does not amount to deception by IBM that concealed its discriminatory motives and prevented Milani from filing a timely claim. Accordingly, because Milani has identified no actions by IBM that actually concealed discrimination or misled him about IBM's motives, he cannot invoke equitable estoppel on this basis.

Milani's other argument for equitable estoppel is based on IBM's repeated warnings to him about complaining to human

resources. According to Milani, IBM convinced him that making internal complaints about mistreatment would harm his career, which is why it took him so long to institute this action. (*See id.*) Under New York law, a defendant may be equitably estopped to assert a statute of limitations defense if it "wrongfully induced the plaintiff to refrain from timely commencing an action by ... threats or other misconduct." *Overall*, 52 F.3d at 404 (quoting *Zoe G. v. Frederick F.G.*, 208 A.D.2d 675, 675, 617 N.Y.S.2d 370, 371 (2d Dep't 1994)). However, even assuming *arguendo* that Milani could show that IBM subjected him to continuous threats about complaining to human resources, he has produced no evidence to suggest that IBM ever made parallel threats about instituting a civil action. Because Milani does not even allege that IBM told him not to file a lawsuit in district court, much less identify facts that so demonstrate, he cannot show that IBM's alleged threats played any role in his failure to bring this action in a timely fashion. Accordingly, Milani may not invoke equitable estoppel on this basis either.

For the reasons discussed above, Milani is time-barred from asserting claims based on incidents that occurred before May 1, 1999.

### III.

Only one of the adverse employment actions Milani lists in his complaint, his termination, occurred after May 1, 1999.[36] (*See* Compl. ¶ 30) In his affidavit, Milani

---

**36.** Milani also alleges in his complaint that the business unit executive position to which he was promoted in July 1999, which had been billed as a management position, "was not a real management position" because Milani was not given the responsibilities that someone in management would have. (Compl.¶ 23) Because Milani does not explain

how a promotion to business unit executive could be considered adverse employment action, and because he does not attempt to make out a prima facie case of discrimination arising from this promotion, I conclude that Milani is not bringing any discrimination claim on the basis of this promotion.

suggests for the first time that Barthelmes subjected him to adverse treatment by failing to promote him to Band 10 despite promising to do so and by failing to pay him "substantial"[37] bonuses. These new allegations are not included in Milani's complaint, and Milani does not attempt to make out a prima facie case of discrimination for these allegedly adverse employment actions. (*See* Pl. Memo. at 17–20) In any event, even assuming *arguendo* that Milani could make out the first three elements of a prima facie case, there are no circumstances surrounding Barthelmes's failure to give Milani these benefits that give rise to an inference of discrimination.[38] Accordingly, the only employment action that need be analyzed in any depth is IBM's decision to fire Milani in April 2001.

■ Milani's state and city claims of discriminatory discharge are analyzed under the burden-shifting framework for Title VII claims that was initially set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999). Under this framework, Milani must first establish a prima facie case of discrimination by demonstrating that: (1) he belonged to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir.2003). If Milani established a prima facie case, the burden then shifts to IBM, which is re-

quired to offer a legitimate, non-discriminatory rationale for its actions. *Id.* at 138. Once IBM has made this showing, Milani can defeat summary judgment only by showing "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.* (internal quotation marks omitted).

■ IBM does not dispute that Milani can make out the first three elements of a prima facie case, but it claims that his age and national origin discrimination claims fail because the circumstances of his termination do not give rise to an inference of discriminatory intent. (*See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 15) Milani disagrees and argues that six facts suggest that his termination was motivated by discrimination: (1) Berthold did not know of anyone else at IBM who was fired for violating the prohibition on dating subordinates; (2) Berthold never interviewed Schimenti during her investigation; (3) Berthold never considered whether Milani's initial attempt to have Schimenti hired by a different department satisfied the requirements of the prohibition on dating subordinates; (4) Berthold had never before recommended termination at the end of one of her open-door investigations; (5) Berthold never considered disciplining Barthelmes for his role in hiring Schimenti; and (6) IBM never investigated Schimenti's allegations of sexual harassment against two other IBM employees of unspecified age who were not of Iranian na-

---

**37.** Milani received a $500 bonus at the end of 1999 and a $4,000 bonus at the end of 2000 (Pagan Aff., Ex. F); apparently these amounts are not "substantial".

**38.** For instance, Milani has not identified any employees who were younger or of a different

national origin who received a promotion to Band 10 or substantial bonuses after May 1, 1999, and he admits that Barthelmes never said or did anything that indicated prejudice on the basis of age or national origin. (Milani Dep. at 179–80)

tional origin. (Pl. Memo. at 18–19) As will be discussed in more detail below, none of these circumstances gives rise to an inference of discrimination based on age or national origin.

First, Milani contends, based solely on Berthold's memory, that he was the only person in IBM history to be fired for dating a subordinate. (*Id.* at 18) However, Milani has identified no other employee who was believed to have violated IBM's dating policy. Indeed, Berthold testified that she was not aware of anyone else at IBM who was investigated for dating a subordinate (Berthold Dep. at 54), and Cooper testified that she did not recall encountering another situation where an employee was romantically involved with another employee. (Cooper Dep. at 42–43) Because there is no evidence that anyone besides Milani was believed to have violated the dating policy, Milani cannot show that he was more harshly treated for his perceived violation than other employees were or would have been, much less that his harsher treatment was motivated by discrimination.

Milani next attacks Berthold's investigation, arguing that Berthold displayed discriminatory bias by failing to interview Schimenti or to consider Milani's attempts to place Schimenti elsewhere in IBM. Again, Berthold's investigatory decisions do not give rise to an inference of adverse treatment, let alone discrimination. To begin with, although Milani argues that Berthold should have interviewed Schimenti (Pl. Memo. at 18), he does not dispute that Schimenti had stopped coming into work at IBM and had refused to make herself available to Berthold, and he does not explain how Berthold reasonably could have interviewed Schimenti under these circumstances. Furthermore, as IBM points out, Berthold credited Milani's description of his relationship with Schimen-

ti, and Milani does not explain why Berthold should have believed that Schimenti, who had accused Milani of sexual harassment, could have provided more exculpatory information about Milani than Milani himself had provided. Milani's other criticism of Berthold's investigation, that she did not give adequate consideration to his attempt to have Schimenti hired by another department at IBM, is also unconvincing. Although Milani suggests that he may not have violated IBM's prohibition on dating subordinates because he first tried to have another manager hire Schimenti before hiring her himself (Pl. Memo. at 19), this unsuccessful attempt is plainly insufficient to satisfy the requirements of the IBM policy, which mandates that an IBM manager who wants to date a subordinate "get himself or herself another job inside or outside IBM, or with the subordinate's agreement, get the subordinate another job in IBM where that is needed to end the reporting relationship." (Bloom Aff., Ex. 8 § 3.3.1.3) Because Berthold's finding that Milani violated the dating policy would not have changed if she had considered Milani's unsuccessful attempt to have Schimenti hired elsewhere, any failure to consider this possibility cannot be considered adverse to Milani, let alone discriminatory. Accordingly, because Milani cannot show that Berthold's investigation was unfair, much less discriminatory, it does not give rise to an inference of discrimination.

In addition to impugning Berthold's investigation, Milani argues also that Berthold's recommendation of termination gives rise to an inference of discriminatory intent because Berthold had never before recommended termination in any investigation and because Berthold did not recommend termination for Barthelmes, even though Barthelmes also had agreed to hire Schimenti. (Pl. Memo. at 18–19) Again, neither of these circumstances gives rise to

an inference of discrimination. While it is true that Berthold had never before recommended termination, she testified that she found that Milani had engaged in "gross, gross misconduct" (Berthold Dep. at 51), and Milani has presented no evidence to show that Berthold gave more lenient recommendations for employees who had engaged in misconduct that she perceived to be equally gross. As for Berthold's failure to recommend termination for Barthelmes, the record shows that Berthold was asked to investigate Milani's relationship with Schimenti, not the decision to hire Schimenti (*see id.* at 18), and Berthold's recommendation that Milani be fired was based on her belief that Milani had been involved in an inappropriate relationship with Schimenti, not on her belief that Milani had acted improperly by hiring an unqualified employee. (*See* Berthold Report at 6) Furthermore, because Milani has not shown that Barthelmes's alleged misconduct—approving the hiring of an unqualified applicant—was of comparable seriousness to Milani's, Barthelmes is not similarly situated to Milani, and the fact that Berthold treated Milani less favorably than Barthelmes therefore does not give rise to an inference of discrimination. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir.2000). In addition, Berthold never said or did anything to Milani that suggested prejudice based on age or national origin. (Milani Dep. at 165–66) Because Milani has again failed to produce any evidence that Berthold treated him more harshly than other similarly-situated employees or that she displayed any discriminatory bias, Berthold's decision to recommend termination in Milani's case does not give rise to an inference of discrimination.

Finally, Milani attempts to show circumstances giving rise to an inference of discriminatory intent by arguing that IBM did not investigate or discipline White and Lindner, who were not of Iranian national origin, even though Schimenti had also accused them of sexual harassment. (Pl. Memo. at 19) Although White and Lindner were similarly situated to Milani insofar as Schimenti allegedly accused all three of sexual harassment, Milani was not terminated because of these allegations but rather because IBM believed that Milani had violated its policy against dating subordinates. (*See* Berthold Report at 6) Indeed, White, Lindner, and Milani received the same treatment from IBM—no investigation and no discipline—with respect to Schimenti's accusations of sexual harassment, and Milani was subjected to an investigation and discipline not because Schimenti had accused him of sexual harassment but rather because he himself confessed to Barthelmes that he had a close, intimate relationship with Schimenti. (*See* Berthold Dep. at 18) Because there is no evidence in the record to suggest that White and Lindner engaged in conduct that was of comparable seriousness to Milani's, Milani has not shown that White and Lindner were similarly situated, and thus he does not raise an inference of discrimination by showing that IBM treated him less favorably than it treated White and Lindner. *See Graham*, 230 F.3d at 39–40.

For the reasons discussed above, Milani has not identified any facts that give rise to an inference of discrimination, and therefore he is not able to make out a prima facie case of discrimination based on age or national origin. Even assuming *arguendo* that Milani had succeeded in making out a prima facie case, he has presented no evidence to rebut IBM's legitimate, non-discriminatory reason for his termination: its reasonable, good faith belief that Milani had violated IBM's prohibition on dating subordinates. *See Ponniah Das v. Our Lady of Mercy Med. Ctr.*, No.

00 Civ. 2574(JSM), 2002 WL 826877, at *11–*12 (S.D.N.Y. Apr.30, 2002), *aff'd* 56 Fed.Appx. 12 (2d Cir.2003) (explaining that employer proffers a legitimate reason for termination if employer based termination decision on reasonable belief that employee had engaged in misconduct). Accordingly, no reasonable jury could find for Milani on his claims of wrongful termination, and IBM's motion for summary judgment is granted with respect to these claims. *See* Fed.R.Civ.P. 56.

\* \* \* \* \* \*

For the above reasons, IBM's motion for summary judgment is granted as to all claims. IBM has submitted also a motion for sanctions, costs, and attorney's fees, arguing that Milani and his counsel should be sanctioned pursuant to Rule 11, 28 U.S.C. § 1927, Title VII, and this court's inherent power for instituting a lawsuit against IBM that was time-barred and filed in bad faith. (*See* Defendant's Motion for Sanctions, Costs and Attorney's Fees; Memorandum of Law in Support of Defendant's Motion for Sanctions, Attorney's Fees and Costs) Because Milani and his attorneys pursued a case that plainly had no merit and attempted to buttress it with an affidavit from Milani that contradicted most of the record, including Milani's own deposition testimony, sanctions may be appropriate here. Accordingly, Milani should file a response to IBM's motion by July 6, 2004, and IBM may file a reply by July 20, 2004.